IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAKE MARSHALL, by and through his | ) | |
| Guardian, Conservator, and Next | ) | |
| Friend, JUDY MARSHALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | |
| MELANIE PICKENS, PAULA | ) | NO. 1:11-CV-01110-WBH |
| MERRITT, and FRANCES BOYD, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT MERRITT'S MOTION TO EXCLUDE TESTIMONY OF EXPERT DR. SAMUEL J. MADDOX

COMES NOW Plaintiff Jake Marshall (hereinafter "Jake"), by and through

his Guardian, Conservator, and Next Friend, Judy Marshall, and, files this brief in

opposition to  Defendant Merritt's motion to exclude testimony of expert Samuel J.

Maddox, Ph.D. [Doc. 250].[1]  For the reasons set forth herein, Defendant Merritt's

motion should be denied.

---

[1] Defendant Merritt's motion is actually a motion to exclude Dr. Maddox's testimony, in part.  Merritt makes general, sweeping arguments unsupported by fact and expert opinion, and then she objects to some of Dr. Maddox's opinions, but she does not object to the majority of his relevant expert testimony, and she does not object to any of his rebuttal testimony.

## I.      Relevant Factual Information

Dr. Maddox has worked in the areas of mental health and developmental disabilities since 1995, and he graduated from Morehouse College with a degree in psychology and from the University of South Carolina with a doctorate of philosophy in psychology.  Deposition of Dr. Samuel J. Maddox, July 10, 2013, relevant portions of which are attached hereto as Exhibit A (hereinafter  "Maddox Dep., Ex. A"), p. 62, lines 17-19, p. 107, line 20 to p. 108, line 8, Pickens' Exhibit 63 to Maddox Dep., Dr. Maddox's Curriculum Vitae, attached hereto as Exhibit B (hereinafter "Maddox CV, Ex. B"), pp. 1-3.

Dr. Maddox is a licensed psychologist in the Georgia.  Maddox CV, Ex. B, p. 1; Maddox Dep., Ex. A, p. 62, lines 17-19.  Prior to receiving his Ph.D., Dr. Maddox served as the coordinator of psychological services at the University of South Carolina.  Maddox CV, Ex. B, p. 3.  In addition, at the Lexington County Community Mental Health Center, Dr. Maddox provided direct behavioral intervention programming, caregiver services, case management, and parent and teacher training for children referred primarily for abuse and neglect.  Maddox Dep., Ex. A, p. 47, lines 12-14, p. 48, lines 1-3, p. 50, lines 18-22.  Dr. Maddox also interned as a behavior specialist for one year at the Marcus Institute.   Maddox Dep., Ex. A, pp. 9-16; Maddox CV, Ex. B, p. 3.  During that time, Dr. Maddox conducted evaluations of disabled children, provided direct instruction to disabled

children, and designed and assessed behavioral programs and trained parents to

implement them.  *Id.*  Dr. Maddox treated children with autism, severe mental

retardation, and other disabilities, and over the course of a year, he rotated through

three programs, including the Severe Behavior Unit.  Maddox Dep., Ex. A, p. 15,

lines 1-2 and 25; p. 16, lines 1-16; Maddox CV, Ex. B, p. 3.  Some of the children

he treated had post traumatic stress disorder ("PTSD") and some were as or more

mentally impaired as Jake.  Maddox Dep., Ex. A, p. 15, line 25 to p. 16, line 3.

Dr. Maddox worked with children with Angleman's when he was at the Marcus

Institute and prior to that.  Maddox Dep., Ex. A, p. 47, lines 5-14.  While at the

Marcus Institute, Dr. Maddox worked with three well known experts in the field of

applied behavior analysis from Kennedy Krieger in Boston.  *Id.* at p. 18, line 24 to

p. 19, line 6.

     Dr. Maddox conducted his post-doctoral fellowship at Emory University

School of Medicine.  I*d.* at p. 46, lines 11-13, p. 341, lines 23-25; Maddox CV, Ex.

B, p. 3.  At Emory, Dr. Maddox conducted neurodevelopmental assessments of

children and developed and implemented regulation and behavioral programs,

primarily working with children who presented with co-morbid traumatic

experiences such as abuse and neglect.  Maddox CV, Ex. B, p. 3.

     After completing his post-doctoral fellowship at Emory, Dr. Maddox

received a grant to become the Director of the University Center of Excellence and

Developmental Disabilities, and Dr. Maddox chose to become a professor at Clayton State University ("CSU") and to go into private practice.  Maddox Dep., Ex. A, p. 26, line 21 to p. 30, line 20, p. 35, lines 8-17, p. 353, lines 9-13.  At CSU, Dr. Maddox teaches undergraduate and graduate courses in all areas of psychology, developmental disorders, therapeutic interventions, and other related subjects, and he conducts program evaluations and consults with non-profit organizations.  *Id.*; Maddox CV, Ex. B, p. 2.  Dr. Maddox also serves as the clinical supervisor of the mental health program for the Clayton County Superior Court.  *Id.*; Maddox Dep., Ex. A, p.8, lines 7-23; p 60, lines 24-25.  Dr. Maddox has taught forensic psychology, and he practices forensic psychology for the court. Maddox Dep., Ex. A, p. 8, lines 7-23; p. 61, lines 4-23.

In Dr. Maddox's private practice, he conducts neurodevelopmental assessments, provides counseling and school consultation, attends Individualized Education Program ("IEP") meetings and behavioral manifestation meetings at public schools, and treats children primarily with a variety of emotional, behavioral, and developmental challenges and co-morbid traumatic experiences, such as a history of abuse, neglect, or aggression.  Maddox Dep., Ex. A, p. 26, lines 16-18; Maddox CV, Ex. B, p. 2.  Dr. Maddox assesses and treats children with a wide range of behavioral and developmental disabilities.  Maddox Dep., Ex. A, p. 36, lines 11-12.

Dr. Maddox became involved with Jake when Jake's mother contacted Dr. Maddox to conduct an evaluation of Jake. *Id.* at p. 114, lines 1-6. Dr. Maddox had three meetings with Jake and four meetings with Jake's mother, and he actually assessed Jake using evaluations. *Id.* at p. 120, lines 9-10, p. 121, lines 8-13, p. 129, lines 18-23, p. 146, lines 12-15, Evaluation of Jake Marshall, attached as Pickens' Exhibit 65 to Maddox Dep. and as Exhibit C hereto (hereinafter "Marshall Eval., Ex. C"). On one meeting with Jake's mother, Dr. Maddox met with the parents of three other children who had been abused by Pickens. Maddox Dep., Ex. A, p. 121, lines 12-13, p. 136, line 21 to p. 138, line 12, p. 142, lines 9-23, p. 143, lines 5-13. Dr. Maddox testified that as a psychologist, he gathers information regarding functioning and consistency of behaviors, and he looks for similarities which can provide even more evidence about a diagnosis. *Id.* In accessing Jake, Dr. Maddox also reviewed Jake's medical records from Laurel Heights and from the Marcus Institute, Jake's educational records, a Fulton County School District ("FCSD") investigative report with witness statements, a Georgia Professional Standards Commission ("GaPSC") investigative report and witness statements, and the depositions of at least six witnesses in this case. Disclosure of Expert Testimony, attached hereto as Exhibit D (hereinafter "Maddox Disclosure, Ex. D"), pp. 1-2. Extensive pleadings filed in several forums and a final decision in a due process hearing matter involving Alex Williams, who was abused by Pickens, were also

reviewed by Dr. Maddox.  *Id.* at p. 2.  Dr. Maddox also consulted with Dr. Michael Mueller.  *Id.*  In sum, Dr. Maddox relied, in forming his expert opinions as a psychologist upon his education, training, experience, and skill in evaluating and treating disabled children, including those who have suffered trauma, abuse, and/or neglect; his evaluation of and meetings with Jake; his meetings and interviews with Jake's mother; his extensive review of Jake's educational and medical records as well as governmental investigative reports; deposition testimony; statements to governmental agencies; pleadings regarding Pickens' abuse of Jake and others; his knowledge and treatment of another child abused by Pickens; his interview of numerous parents of disabled children abused by Pickens; and his consultations with Dr. Michael Mueller.

Based upon the above and using the standard International Classification of Diseases ("ICD") codes, Dr. Maddox diagnosed Jake, as follows:

**Axis I:**  309.81 Post-traumatic Stress Disorder ["PTSD"]

318.2 Profound Mental Retardation

**Axis II:**  None

**Axis III:**  759.89 Angelman Syndrome

**Axis IV:**  Prior chronic abuse by teacher

**Axis V:**   GAF current-12

Marshall Eval., Ex. C, p. 6.  Dr. Maddox explained that Jake's behavioral profile was consistent with a diagnosis of PTSD due to the serious maltreatment Jake suffered for a three-year period, and explained PTSD in his evaluation report.  *Id.* Based upon the findings of his psychological evaluation, Dr. Maddox recommended that "[b]ecause Jake has profound deficiencies in cognitive, language, motor and adaptive behaviors and displays seriously social-emotional dysregulation related to his PTSD, he will require an intensive inpatient behavioral intervention program to assist him with developing emotional regulation as part of his recovery from trauma and recovering skills lost in response to the trauma.  The Kennedy Krieger Institute Neurobehavioral Unit is an inpatient unit serving the needs of individuals like Jake by providing intensive behavioral intervention and monitoring." *Id*. at p. 7.  In his evaluation report, Dr. Maddox made numerous other important recommendations for Jake.  *Id.* at pp. 7-8.

## II.    Legal Argument and Citation of Law

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the

case." Fed. R. Evid. 702.

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

Fed. R. Evid. 702, Notes of Advisory Committee on Proposed Rules.

> In determining whether one is an expert and whether his testimony should be

admitted,

> *Daubert* itself emphasized that the factors were neither exclusive nor dispositive. Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony. In addition to *Kumho*, 119 S.Ct. at 1175, *see Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996) (noting that the factors mentioned by the Court in *Daubert* do not neatly apply to expert testimony from a sociologist). *See also Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 809 (3d Cir. 1997) (holding that lack of peer review or publication was not dispositive where the expert's opinion was supported by "widely accepted scientific knowledge"). … A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (noting that the trial judge has the

discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

Fed. R. Evid. 702, Committee Notes on Rules – 2000 Amendment.

## A. **Dr. Maddox is Qualified As an Expert**

To practice psychology in Georgia, an individual must be licensed (unless an exception applies). *See* O.C.G.A. § 43-39-7. It is undisputed that Dr. Maddox is a licensed psychologist in the State of Georgia, and thus, he is qualified to practice psychology. "'To practice psychology' means to render or offer to render to individuals, groups, organizations, or the public … any service involving the application of recognized principles, methods, and procedures of the science and profession of psychology, such as, but not limited to, diagnosing and treating mental and nervous disorders and illnesses, rendering opinions concerning diagnoses of mental disorders, … interviewing, administering, and interpreting tests of mental abilities, aptitudes, interests, and personality characteristics for such purposes as psychological classification or evaluation, or for education or vocational placement, or for such purposes as psychological counseling, guidance, or readjustment." O.C.G.A. § 43-39-1 (3).

Dr. Maddox has clearly applied recognized principles, methods, and procedures of the science and profession of psychology, as he diagnosed and proposed a treatment plan for Jake's mental and nervous disorders and illnesses

and he rendered opinions concerning diagnoses of mental disorders as well as administered and interpreted tests of mental abilities, aptitudes, and other matters for psychological classification, evaluation, placement, and counseling.  Since 1995, Dr. Maddox has evaluated, treated, or evaluated and treated disabled individuals who have a PTSD diagnosis or otherwise experienced trauma, and he is otherwise qualified as an expert in psychology.  Maddox CV, Ex. B, pp. 1-4.

### B. Dr. Maddox is Qualified to Render an Opinion as to Child Abuse

At least ten eye witnesses have reported to the FCSD and GaPSC, testified in the administrative due process hearing for Alex, and/or testified in depositions in this case that Pickens repeatedly abused Jake and other disabled children.  *See, e.g.* Deposition of Amanda Mathis Groover, September 28, 2012, p. 36, lines 22-25: Groover saw Pickens abuse Jake more than once, p. 37, lines 9-19:  Grover saw Pickens throw Jake up against a wall, p. 42, lines 16-25:  Pickens abused Jake and his classmates every day and it was very sad, p. 47, line 19 to p. 49:  Pickens restrained Jake to a Rifton chair and put him in a room by himself two or three times a week; Deposition of Judy Reddick, September 27, 2012, p. 133, line 6 to p. 134, p. 136, lines 9-18:  Reddick, a FCSD nurse, saw Pickens hit Jake in his head multiple times, and when Pickens hit Jake, the blow was hard enough to make Jake's head move, and Jake would cower, duck, and place his hands over his head when Pickens came near him, p. 138, lines 4-11:  Reddick heard Pickens

frequently call Jake a "little f_cker" and a "little sh_t," p. 141, line 19 to p. 142, line 15:  Reddick visited the school a few times a week and just about every time she came, Jake was abandoned in a room by himself; Deposition of Yasaland King, December 14, 2012, p. 202, lines 7-14:  Pickens admitted to King that Pickens had thrown a camera at Jake, p. 204, line19 to 205, line 12, p. 209, lines 5-10:  King saw Pickens kick Jake every other day if not every day, and Jake would moan when Pickens kicked him.  King saw Pickens kick Jake 4 or 5 times a week, p. 209, lines 15-19:  When Pickens would isolate and abandon Jake in a room, sometimes he would not get lunch, p. 209, line 23 to p. 211, line 1:  King saw Pickens get up on Jake and put her buttocks in Jake's face and pass gas in his face about once a week, p. 213, line 2 to p. 215, line 2:  King saw Jake with feces all over himself three different times when Pickens would abandon him in a room by himself restrained to a chair, and on one of those days Pickens had abandoned Jake for a full day, p. 223, lines 10-15:  Jake was never violent and never gave King any problem, but Pickens was violent to Jake, p. 226, line 22 to p. 228 line 17:  King "often" saw Pickens put her buttocks in Jake's face and swish it around and put her breasts in his face and move them around his face and push them into his face, p. 230, lines 10-18:  Pickens called Jake a "little f_cker" and a "little sh_t," p. 229, line 13 to p. 230, line 9:  Pickens would not be telling the truth if Pickens said she never burped on Jake, never kicked Jake, never put her breasts and buttocks in his

face, never put him in a room in a Rifton chair, and never deprived him of food, p.

236, lines13-19:  When Pickens kicked Jake, he would never try to hit Pickens but

would just moan; Deposition of Denise Baugh, March 26, 2013, p. 268, lines 14-

15:  Baugh has seen Pickens hit Jake, p. 270, line 15 to p. 271, line 16:  Baugh has

seen Pickens kick Jake, p. 271, line 19 to p. 274, line 17:  When Jake and other

disabled students could not do as Pickens demanded they do, Pickens would pass

gas in their faces, spray Lysol on them, touch them aggressively, kick them, mostly

hit them, and scream at them, p. 273, lines 18-23:  Pickens would push Jake into

the locker because he could not put his coat and book bag up, p. 280, line 18 to p.

281, line 9:  Pickens would restrain Jake in a Rifton chair and also restrain his arms

so he could not use them, p. 273, line 16 to p. 282, line 14:  Baugh never had to

abuse Jake to get him to do things, p. 285, line 2 to p. 286, line 21:  Baugh saw

Pickens hit Jake on the shoulder hard enough to move him and to make him scream

out, and Baugh saw Pickens kick Jake even more often than Pickens hit him, p.

287, lines 8-14:  Baugh saw Pickens pass gas in Jake's face with Pickens' buttocks

right in Jake's face, p. 291, line 17 to p. 292, line 20:  Baugh never had any trouble

educating Jake when Pickens was not around, p. 299, lines 3-25:  Baugh saw

Pickens put Jake in a room in a chair by himself with the lights out for hours, and

when Jake was restrained and abandoned in a room by himself, he would scream

for hours, p. 313, line 4 to p. 315, line 18:  Baugh saw Pickens knee Jake in the

back, hit him, and kick him, and Jake would never do anything to Pickens, but he would scream out when he was being aggressed by Pickens, p. 337, line 8 to p. 338, line 2:  Baugh saw Pickens push Jake down on the tile floor, p. 346, line 15 to p. 347, line 2:  Baugh was afraid for Jake and thought he could be killed when Pickens pushed him down; Baugh was afraid for all the children, p. 363, lines 17-24:  Baugh saw Pickens put her breasts in Jake's face with a low cut shirt on in the bathroom, p. 366, lines 8-14:  Baugh saw Pickens throw Jake into the locker and kick him; Deposition of Judy Massey, February 27, 2013, p. 284, line 2 to p. 285, line 16 and p. 298, line 2 to p. 299, line 3 and p. 301, lines 6-22:  Massey saw Pickens throw a camera at Jake and hit him in the head, making a "knot like an egg," and Pickens said they would tell Jake's mother a lie about what happened, p. 280, line 17 to p. 283, line 4:  For three years, Massey saw Pickens take Jake behind the class door, put his face into the concrete wall, and use her body against his pressing him into the wall and lifting him so his feet were off the floor; Pickens called this "jacking him up," p. 288, lines 1-17:  Jake and all the other children in Pickens' class would cower when Pickens came near them or made a loud noise, p. 295, line 4 to p. 296, line 18:  Pickens would shake her buttocks in Jake's and the other children's faces and pass gas in their faces; p. 307, lines 12-14:  Pickens called Jake a "little f_cker," p. 311, line 11 to p. 312, line 2:  Massey saw Pickens throw her hard shoes at Jake, p. 317, line 14 to p. 318, line 2:  Pickens restrained

Jake to a Rifton chair and left him when he was loud and giggly, even though his

behavior was no more disruptive than the other disabled students, p. 318, line 24 to

p. 320, line 3:  On May 21, 2007, Pickens restrained Jake in a Rifton chair and

isolated him in a room by himself, and he had feces all over himself, including his

face, and Massey believes in his mouth, and Massey had seen this happen before,

but never quite that bad, p. 321, lines 3-25:  Pickens would put Jake restrained to a

Rifton chair by himself in a room for an entire day or half a day; Deposition of

Cynthia Eitmann, December 18, 2012 and February 20, 2012, p. 105, lines 10-23:

Eitmann heard Pickens call a student a "little sh_t" and saw Pickens push Jake and

Alex down more than once, p. 106, lines 1-16:  Pickens pushed Jake down on hard

floors or on cement, p. 107, line 24 to p. 114, line 18:  Pickens screamed at the

children, became more aggressive over the years, became wilder over the years,

abused Jake and his peers verbally and physically, used excessive force on Jake,

pinned Jake face first against metal lockers and cinderblock walls, forcibly pushed

Jake into metal lockers, pushed Jake against lockers and walls and lifted him off

the ground by putting her knee in his crotch, was too aggressive with the children

over a three year period, and isolated and restrained children in two different

rooms, and Eitmann did not want to work with Pickens because of the way she

treated the children, p. 115, line 11 to p. 117, line 3:  If Pickens denied pushing,

isolating, being aggressive to children she is a liar; p. 124, line 1 to p. 125, line 16

and p. 128, lines 17-18, p. 129, line 25 to p. 130, line 17:  Eitmann saw Pickens put Jake isolated in a room by himself in a chair with the door closed and Jake would scream so loudly you could hear it down the hall, p. 188, lines 6-11:  Eitmann was afraid for Jake to be in Pickens' class, p. 194, lines 22-24:  Pickens yelled so loudly at the children Eitmann needed to get out of the room for a break; Deposition of Stephanie Sosebee, October 22, 2012, p. 184, lines 17-22:  Sosebee saw Pickens push Jake against the wall and put her knee in his crotch and lift him off the ground, p. 190, lines 9-11:  Sosebee told Pickens she needed anger management counseling, p. 197, lines 3-20:  If Pickens said she never restrained and isolated Jake in a room, never cursed in front of him, and never kneed him, Pickens would not be telling the truth, p. 199, line 20 to p. 200, line 12:  Towards the end of the last school year (2006-2007), Pickens put Jake at least once a day in a room by himself confined to a Rifton chair, and before that it was twice a week, p. 200, line13-17:  On May 21, 2007, Jake had been restrained to a chair in a room by himself basically all day, p. 203, line 23 to p. 205, line 24:  When Sosebee saw Pickens put her knee in Jake's back, it looked hard, and it was bad the way Pickens used her foot and knee on Jake, so Sosebee called Pickens many times to talk to her about her actions and told her not to do them, p. 214, line 20 to p. 215, line 22: Pickens would get "mad" and be rough, loud, angry, and aggressive; Deposition of Susan Tallant, April 10, 2013, p. 56, lines 6-18, p. 58, line 1 to p. 62, line 25, p. 71,

lines 6-11:  When Pickens left Jake restrained to a chair in a room by himself, Jake got feces all over his face, around his mouth, in his eyes, down his checks, in his ears, on his eyes, and in his hair, p. 90, line 13 to p. 92, line 22, p. 95, lines 2-21: Pickens put Jake in a room by himself restrained to a chair many times, p. 97, lines 21-23:  Pickens would kick Jake over to the lockers or over to the classroom, p. 99, lines 4-6:  Pickens would pull Jake up by suspenders, p. 99, line 16-24:  Pickens would drag Jake by his arm across the floor, p. 104, lines 19-21:  Pickens would pull Jake's pants up into his crotch, p. 105, line 18 to p. 107, lines 1-4:  Pickens would shove or push Jake into a locker on a daily basis, p. 107, line 15 to 108, line 6:  Tallant could hear Pickens screaming at Jake through the classroom walls, p. 125, line 18 to p. 126, line 24:  Pickens would slam Jake into lockers, kick Jake repeatedly, place him roughly in his seat, and use excessive force when tightening his seat belt, p. 152, line 10 to p. 153, line 2:  Pickens screaming at Jake and his classmates was excessive and every day all day long, p. 157, lines 1-21:  Pickens made excessive noise slamming Jake and Alex Williams into lockers.  *See* Depositions, Docs. 251-2 to 251-10.

In 2007, FCSD conducted an investigation using an outside agency into Pickens, and "[t]he investigation determined a clear pattern of inappropriate behavior on the part of Melanie Pickens which rises to the level of criminal assault and battery on a student…. [T]here [wa]s evidence that Ms. Pickens falsified an

official school document in writing a report on the injury…. The investigation

determined evidence that Melanie Pickens engaged in abusive and neglectful

treatment of several other students in her care, in addition to Jake Marshall. These

students suffered from severe mental and physical impairments and were non-

verbal.  Her inappropriate behavior and treatment ran the gamut from being too

rough with special education students, to sheer meanness." Doc. 223-1( FCSD

Report of Investigation, July 20, 2007).

Even Pickens' own expert psychologist concluded that what Pickens did to

Jake was "child abuse" and "criminal behavior," and as a psychologist, he would

have reported Pickens for child abuse.  *See* Deposition of Tyler Whitney, July 11,

2013, relevant portions attached hereto as Exhibit E, p. 37, line 25 to p. 38, line 18,

p. 39, line 18 to p. 40, line 18.  *See also id.* at p. 77, lines 1-24 ("psychologically

abusive"), p. 129 ("horrific," "shocking," and "appalling"), p. 130, line 5 to p. 131,

line 4 (" harsh and significant abuse").  Pickens' other expert tries to minimize

Pickens' abuse of Jake but admits Pickens' behavior was abusive.  Deposition of

Peter Ash, June 11, 2013, relevant portions attached hereto as Exhibit H,

(hereinafter "Ash Dep., Ex. H"), p. 334, lines 11-12.

Dr. Maddox is a psychologist who is mandated by State law to report

suspected child abuse and who by statute can evaluate a child who is suspected of

being a victim of abuse.  *See* O.C.G.A. §§ 19-7-5 (c) (1) (D) and 15-11-101 (c),

(d), (e), respectively.  Child abuse is defined as physical injury, death, neglect, exploitation, sexual abuse, or sexual exploitation.  O.C.G.A. § 15-11-101 (b) (4).

It is Dr. Maddox's education, training, skill, experience, and profession to diagnose, treat, evaluate, and report children who are abused, so he can clearly form an opinion as to whether Pickens' behavior was child abuse, which is an illegal act in Georgia.  *See* O.C.G.A. §§ 16-5-70; 16-5-72.  Pickens asserts she just acted in good faith, and the fact that her acts were abusive is relevant to address that affirmative defense.  *See U.S. v. Nixon*, 918 F.2d 895, 905 (11th Cir. 1990) ("Considered in context, the police detective's use of the term 'conspiracy' was a factual--not a legal--conclusion and did not track unduly the definition of the offense in 21 U.S.C. Sec. 846.").

## C. Dr. Maddox is Qualified to Diagnose Jake with PTSD

Dr. Maddox is a licensed psychologist, and as such, he is authorized by statute to diagnose patients.  After Dr. Maddox evaluated Jake, interviewed his parent and other parents, reviewed extensive records and evidence, and consulted with another expert, he diagnosed Jake with PTSD.  How many individuals Dr. Maddox has diagnosed with PTSD is totally irrelevant to his ability and skill to render a diagnosis of PTSD, even though he has evaluated and treated patients with PTSD and trauma.  Maddox CV, Ex. B, pp. 2, 3.  Dr. Maddox could have never diagnosed or treated any child with PTSD, and this would not equate to Dr.

Maddox not being competent, as a trained and licensed psychologist, to render such a diagnosis.   Merritt also ignores the fact that it is scientific methodology when Dr. Maddox renders a diagnosis.  *See* O.C.G.A. § 43-39-1 (3).

Dr. Maddox explained in his report, rebuttal report, and testimony PTSD, the Diagnostic and Statistical Manual of Mental Disorders: Fourth Edition Text Revision (DSM-IV) criteria for PTSD, and his diagnosis of Jake with PTSD and how Jake met the DSM-IV criteria.  Disclosure of Expert Testimony, Ex. D, pp. 9-12; Maddox Dep., Ex. A, p. 154, lines 14-19, p. 162, lines 3-4, p. 186, lines 11-14, 15-18, 19-23, p. 221, line 23 to p. 222, line 18, p. 224, lines 18-25, p. 233, lines 2-15, p. 234, line 1 to p. 236, line 21, p. 242, line 16 to p. 243, line 14, p. 245, line 10 to p. 246, line 8, p. 249, lines 4-6, pp. 250-254, p. 259, lines 10-25, p. 260, line 1 to p. 263, line 22, p. 274, line 21 to p. 276, line 19, pp. 287-291, p. 301, lines 9-25; Rebuttal of Expert Testimony, attached hereto as Exhibit G (hereinafter "Maddox Rebuttal, Ex. G").  Dr. Maddox explained that the new DSM-V did not exclude Jake from a diagnosis of PTSD and that the DSM-V PTSD criteria are actually moving towards expanding the diagnosis to rectify some of the earlier concerns. Maddox Dep., Ex. A, p. 188, lines 12-20.  Dr. Maddox conducted research with Nathan Fox and Jon Richters from the National Institute of Mental Health involving child abuse activities and their link to PTSD.  *Id.* at p. 220, lines 11-22.

It is not just Dr. Maddox's opinion that Jake has PTSD, it is his diagnosis, and both are reliable and should be allowed into evidence.  Dr. Maddox, *contrary to Merritt's allegations*, in forming his opinions regarding Jake, does rely upon the science of psychology as well as the DSM-IV, which Defendant's Pickens' expert relied upon in arguing Jake does not have PTSD, and Dr. Maddox's expert opinions are much more consistent with the overwhelming evidence and the science of his profession than those of Dr. Ash's.[2]  *See also U.S. v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1992) (citation omitted) ("It is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.'").

Dr. Maddox relied upon his experience, practice, training, and education as a psychologist as well as his evaluation of Jake and extensive other reliable facts and data.  Dr. Maddox also explained *additional* principles supporting his diagnosis of

---

[2] Based upon less facts and data, Dr. Ash, whom Pickens had paid $58,000, before his deposition, to be an expert, and who did not administer even one evaluation to Jake, claims Jake does not have PTSD because 1) Dr. Ash applied a DSM-IV standard not imposed by the DSM-IV and which is **contradicted** by both Dr. Maddox and by Pickens' other expert, Dr. Whitney, and 2) Dr. Ash downplays what Pickens did to Jake, saying it was just "minor stuff."  Deposition of Dr. Peter Ash, June 11, 2013, p. 6, line 19 to p. 7, line 7, p. 55, lines 15-16, p. 248 lines 11-12.  Interestingly, Dr. Ash testified he would be "outraged" if Pickens did to his child what she did to Jake.  *Id.* at p. 335, lines 9-11.  Dr. Maddox's opinion and diagnosis meets Rule 702 standards, and Plaintiff should be allowed to address Dr. Ash's unfounded conclusions.

PTSD and how they were reliably applied to the facts in his rebuttal statement to

Pickens' experts.  Maddox Rebuttal, Ex. G.

### D. Dr. Maddox is Qualified to Testify as To Jake's Needs

Dr. Maddox is qualified as a psychologist who evaluated Jake and undertook

extensive research into Jake's functioning, condition, abuse, and needs to testify as

to what Jake requires, including intensive residential treatment.  Maddox

Disclosure, Ex. D, pp. 1-5, 9-15.  What Dr. Maddox does by education, training,

profession, skill, licensure, and practice is to, inter alia, evaluate and diagnose

disabled individuals and prepare and recommend programming, treatment, and

placements for them.  *See* pages 1 to 8, *supra*.  *See also* O.C.G.A. § 43-39-1 (3).

Therefore, his expert opinion that Jake requires intensive intervention to address

the abuse suffered is admissible, as it is based upon overwhelming reliable facts

and the implementation of reliable scientific principles and methods to those facts.

### E. Dr. Maddox Is Competent to Testify to Placement at Kennedy Krieger

As set forth earlier, Dr. Maddox worked directly with three top behavior

specialists from Kennedy Krieger, which was the parent organization of the

Marcus Institute when Dr. Maddox was at Marcus.  Maddox Dep., Ex. A, p. 19,

lines 3-6, p. 175, lines 3-8.  Dr. Maddox explained that Kennedy Krieger is

actually a more intensive program and provides residential treatment, unlike the

Marcus program.  *Id.* at lines 19-24, p. 178, line 19 to p. 179, p. 15.  Dr. Maddox

also spoke directly with the financial counselor at Kennedy Krieger about services and costs related to that placement and is aware of the admissions requirements at Kennedy Krieger. *Id.* at p. 176, lines 5-23, p. 177, lines 11-17.  In addition, Dr. Maddox consulted, as stated in his report, with Dr. Mueller, who is also an expert who worked for Kennedy Krieger and who himself recommended Jake be placed at Kennedy Krieger. *See* Maddox Disclosure, Ex. D, p. 2; Deposition of Dr. Michael Mueller, June 12, 2013, relevant portions of which are attached hereto as Exhibit F, p. 22, lines 11-15, p. 122, line 21 to p. 123, line 10 and p. 147, line 21 to p. 148, line , p. 154, lines 2-12, p. 158, line 11 to p. 159, line 17.

That two experts have the same exhibit list in no way suggests that Plaintiff wrote their reports, and the reports differ in many significant ways.  Merritt alleges without any factual basis that Dr. Maddox's report is "manufactured by Plaintiffs [sic]," but this is not true, and Dr. Maddox testified he himself wrote his report. Maddox Dep., Ex. A, p. 152, lines 2-23.

## F.  Dr. Maddox's Opinions Will Assist the Trier of Fact

Dr. Maddox's expert opinions regarding Jake; PTSD; Jake's PTSD; education and special education issues, including but not limited to BIP's, IEP's, placement, behavior modification, discipline, and psychoeducation; and Jake's injuries and treatment needs because of the Defendants' actions are very relevant and will clearly assist the jury.  In fact, it is ludicrous for Defendant Merritt to

argue that Dr. Maddox only offers what lawyers will argue in closing.  A diagnosis of PTSD and expert psychologist treatment recommendations for an abused, disabled child are not matters a lawyer simply argues in closing if they are not in the record, and they are not matters a lay person just knows from common sense. That Dr. Maddox is not a professional expert witness who makes his living or a large part of it from testifying does not make him any less of an expert.  In fact, it makes him more reliable and credible.  Likewise, that Dr. Maddox set forth facts in his report does not make him any less of an expert on critical issues regarding Jake, his diagnosis, his complications, his injuries, and his needs, as well as to educational and special educational issues.

### G.  Dr. Maddox's Use of Information Regarding Abuse is Relevant

Dr. Maddox's testimony regarding the information he gained of similar presentations of other disabled children whom Pickens abused is relevant to show similar responses to and impact of the abuse.  The disabled children whom Pickens abused regressed with toileting, communication, self injurious behavior, and functional skills, and they present with similar trauma impact, such that this information is relevant.  Jake is a non-verbal child, and the Defendants argue what happened to Jake did not impact him, yet he and the other children all suffered in numerous similar ways (at least three have been diagnosed with PTSD by different physicians and/or psychologists).  Pickens also argues that while she never did any

of these acts, if she did, she had to do so to control Jake.  The fact she did these acts to other children who did not present like Jake is relevant.  The fact that Pickens abused disabled children in front of Jake is relevant as well.

### H.  <u>The Effect of the On-going, Three-Year Abuse is Relevant</u>

Expert opinions regarding the injury suffered by Jake due to Boyd's and Merritt's failure to report the abuse and their cover up of the abuse is relevant and should be presented to the jury, for Merritt's and Boyd's actions allowed the abuse, ensured the abuse of Jake continued for three years, and delayed Jake's parents in learning of the abuse, all of which Dr. Maddox has testified and set forth in his disclosures caused significant injury to Jake, for the abuse was on-going and intensive and treatment was delayed.

### III.  <u>Conclusion</u>

For the foregoing reasons, Defendant Merritt's motion should be denied. Should this not be clear to the Court, Plaintiff requests a *Daubert* hearing.

### IV.  <u>Certification</u>

Pursuant to Local Rule 7.1D, the undersigned hereby certifies that the within and foregoing Brief was prepared with Times New Roman 14-point font, as permitted by Local Rule 5.1C.

This the 22nd day of August 2014.


                                             /s/ Chris E. Vance

                                           Chris E. Vance

                                           Ga. Bar No. 724199

                                           Counsel for Plaintiff


**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
Email:  chris@chrisvancepc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Plaintiff's Brief** has been served electronically via email upon counsel for all Defendants.

This 22nd day of August 2014.

           /s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199

Counsel for Plaintiff

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
Email:  chris@chrisvancepc.com