IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| JAKE MARSHALL, by and through his Guardian, Conservator, and Next Friend, JUDY MARSHALL, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE |
| MELANIE PICKENS, PAULA MERRITT, and FRANCES BOYD, | ) ) ) | NO. 1:11-CV-01110-WBH |
| Defendants. | ) ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT MERRITT'S MOTION TO EXCLUDE
TESTIMONY OF EXPERT DR. MICHAEL M. MUELLER**

COMES NOW Plaintiff Jake Marshall (hereinafter "Jake"), by and through

his Guardian, Conservator, and Next Friend, Judy Marshall, and, files this brief in

opposition to  Defendant Merritt's motion to exclude testimony of expert Michael

M. Mueller, Ph.D. [Doc. 248].[1]  For the reasons set forth herein, Defendant

Merritt's motion should be denied.

---

[1] Defendant Merritt's motion does not address the majority of Dr. Mueller's expert
opinions contained in his disclosure report and fails to address any of his opinions
set forth in his rebuttal report.  Thus, it should be, in actuality, a motion to exclude
only a portion of his testimony as an expert.

## I.   <u>Relevant Factual Information</u>

Dr. Mueller is a board certified behavior analyst ("BCBA") at the Ph.D.

level and has his B.A. in psychology and his M.A. and Ph.D. in school psychology.

Curriculum Vitae of Dr. Michael M. Mueller, Ph.D., attached hereto as Exhibit A

(hereinafter "Mueller CV, Ex. A"), pp. 1, 5.  To become a BCBA, Dr. Mueller had

to demonstrate education in applied behavior analysis ("ABA"), complete 1,500

hours of supervised experience, and pass a comprehensive examination.

Deposition of Michael M. Mueller, Ph.D., June 12, 2013, relevant portions of

which are attached hereto as Exhibit B (hereinafter "Mueller Dep., Ex. B"), p. 19,

line 18 to p. 20, line 1.  Dr. Mueller also must take 12 hours a year of continuing

education in field, with 3 of those hours in ethics.  *Id.* at p. 20, lines 2-9.

During work on his graduate degrees, Dr. Mueller focused on assessing and

treating behavior problems in elementary, middle, and high school students for

four years, and he completed his dissertation on treatment of escape-maintained

behaviors in public school classrooms.  *Id.* at p. 26, line 4 to p. 28, line 25.  Sixty

to seventy percent of the students Dr. Mueller worked with had severe disabilities.

*Id.* at p. 29, lines 20-23.

Before receiving his Ph.D., Dr. Mueller conducted his pre-doctoral

internship with Kennedy Krieger Institute of Johns Hopkins University School of

Medicine at the Marcus Institute.   Mueller CV, Ex. A, p. 2.  While with Kennedy

Krieger, Dr. Mueller's supervisors were Cathleen C. Piazza and Wayne W. Fisher, both of whom are well-known for their leading work in ABA.  *Id.*; Deposition of Dr. Samuel, relevant portions attached as Exhibit A to Plaintiffs' Brief in Opposition to Exclude the Testimony of Dr. Maddox, p. 18, line 24 to p. 19, line 6. Dr. Mueller worked with children with severe behavior issues while at the Marcus Institute.  Mueller Dep., Ex. B, p. 32, lines 6-25.

Dr. Mueller completed his post-doctoral fellowship in ABA and school consultation with The May Institute, which educated children with disabilities and provided behavioral services, including but not limited to school consultation and parent training.  *Id.* at p. 34, lines 5 to p. 36, line 22; Mueller CV, Ex. A, p. 2. Before receiving his doctorate, Dr. Mueller gained extensive training and experience in school psychology, research, ABA, developmental disabilities, and school consultation.  Mueller CV, Ex. A, pp. 1-5, 8-9, 10-11, 14-17, 19-21.

Dr. Mueller is the co-owner of and director of behavioral services for Southern Behavioral Group ("SBG"), which provides consultative, behavioral, and educational services predominantly to school systems but also to organizations and families.  Mueller Dep., Ex. B, p. 6, line 9 to p. 8, line 9.  Dr. Mueller and his partner, Dr. Ajamu Nkosi, who has his Ph.D. in educational psychology, provide behavioral and educational services throughout Georgia, as well as in Florida, Tennessee, Alabama, and South Carolina.  Mueller Dep., Ex. B, p. 6, line 9 to p. 8,

line 9, p. 19, lines 14-17.  SBG hires behavior analysts, behavior therapists, and educational consultants.  *Id.* at p. 7, lines 2-5.  Eighty to eighty-five percent of SBG's clients are school systems, and SBG has assisted different schools in 24 or 25 county or city school districts in Georgia.  *Id.* at p. 57, line 22 to p. 58, line 2, p. 59, lines 8-16.  SBG and Dr. Mueller have worked with  the Fulton County School District ("FCSD") in the past and most recently conducted a functional behavior assessment "("FBA") for FCSD.  *Id.* at p. 60, lines 14-19.   Dr. Mueller is also a part-time professor at Georgia State University, where he teaches masters and doctoral level students through the Department of Special Education and Educational Psychology.   Mueller CV, Ex. A, p. 3.

Dr. Mueller and SBG specialize in providing direct and indirect services to individuals with disabilities, including but not limited to the provision of behavioral assessment, intervention, and recommendations; analyses of the effectiveness of behavioral programs; data collection and assessment of data collection; conducting educational, language, and skills assessments; designing and recommending proper educational and/or behavioral programming; training; and management of severe behavior.  Disclosure Report, January 23, 2013, attached as hereto as Exhibit C (hereinafter "Mueller Disclosure, Ex. C"), p. 2.

Prior to founding SBG, Dr. Mueller was the Director of School Consultation Services and Director of the Center for Applied Research for May South and the

Clinical Director for May South Florida.  *Id.* at p. 2.  Earlier in his career, Dr. Mueller served as a functional behavior specialist for a public school district as well as in many other roles involving psychology, ABA, developmental disabilities, and special education.  *Id.* at pp. 2-3.

Dr. Mueller has received awards for his scholarship and his advancement of ABA.  Mueller CV, Ex. A, pp. 4-5.  In addition, he has served as the president for the Georgia Association of Behavior Analysis and the co-chair for the National Association of School Psychologists, Behavioral School Psychology Group.  *Id.* at p. 5.  He is an Editorial Board Member for the *Journal of Early Intensive Behavioral Interventions, Psychology in the Schools, School Psychology Quarterly, Behavior Modification, and Journal of Evidence Based Practices for Schools*.  *Id.* at pp. 5-6.  He is a member of nine professional organizations, including the National Association of School Psychologists, American Psychological Association, and Association of Behavior Analysis.  *Id.* at p. 6.

Dr. Muller has co-authored nine books, including *The Assessment of Functional Living Skills* and *Behavior Analytic Consultation to Schools*, and he has co-authored eighteen nationally referred publications primarily in areas of behavior assessment, analysis, and modification; special education; developmental disability; and consultation.  *Id.* at pp. 6-7.  In addition, Dr. Mueller authored the "Functional Analysis" chapter and co-authored five additional chapters involving

behavior analysis, modification, treatment and consultation in *The Comprehensive Encyclopedia of School Psychology*, 2004, T.S. Watson & C.S. Skinner (Ed.s).  *Id.* at p. 9.  Dr. Mueller has presented nationally and internationally on the topics of ABA, FBA's, behavior modification, skill acquisition for disabled children, consultation and training, behavior assessment and management, mental retardation, autism, parent training, and other related subjects.  *Id.* at pp. 9-19.  Dr. Mueller has also provided numerous school-based workshops on a variety of topics, including skill acquisition, assessment of skills, ABA, teaching disabled students, Individualized Education Program ("IEP") development, data collection, FBA's, curriculum-based assessment, behavioral interventions, mental retardation, autism, academic deficits of disabled children, and other such areas.  *Id.* at pp. 19-20.

Dr. Mueller has worked directly with children who have been diagnosed with Angleman's, mental retardation, PTSD, or a combination thereof.  Mueller Dep., Ex. B, p. 42, lines 4-25, p. 45, lines 8-25, p. 46, lines 1-9, p. 37, lines 9-13, p. 49, line 16 to p. 50, line 21, p. 79, lines 9-16, p. 85, lines 7-11.

Dr. Mueller initially became involved with Jake in 2009 when FCSD, Jake's then school system, contacted Dr. Mueller for assistance.  *Id.* at p. 89, lines 11-19, p. 275, lines 5-6.  At that time, Jake was placed at the Marcus Institute (now Marcus Autism Center), and Dr. Mueller reviewed Jake's records, went to Jake's

home and interviewed his parents, and observed Jake at the Marcus Institute.  *Id.* at

p. 90, lines 10-12, p. 102, lines 22-24.  Dr. Mueller discussed Jake with Marcus

staff and received and reviewed records (behavioral data) from Marcus.  Mueller

Disclosure, Ex. C, p. 1; Mueller Dep., Ex. B, p. 275, lines 5-19.  The next

involvement Dr. Mueller had with Jake occurred when Jake's mother contacted Dr.

Mueller in 2012 to see if Dr. Mueller could provide services to Jake when he was

in Rabun County, Georgia.  *Id.* at p. 92, line 15 to p. 93, line 17, p. 99, line 4 to p.

100, line 10, p. 117, lines 9-19.  Ms. Marshall did not contact Dr. Mueller for any

litigation but instead she and Dr. Mueller had extensive phone conferences to see if

Dr. Mueller and his group could provide services for Jake.  *Id.*

　　　In Dr. Mueller's later role as an expert in this matter, in forming his expert

opinions, Dr. Mueller relied upon his education, years of experience, research,

practice, prior direct observation of Jake at the Marcus Institute, as well as

numerous interviews and discussions with Jake's parents over the years, interviews

with other parents of disabled children whom Pickens abused, as well as extensive

documentation, including but not limited to past psychological reports, medical

records from Laurel Heights Psychiatric Hospital, behavioral data from the Marcus

Institute, behavioral intervention plans ("BIP's"), FBA's, and IEP's from second

grade to present, agendas during the three-year time Pickens abused Jake, data

summaries of the agendas, a FCSD investigative report of Pickens' abuse with

statements, a Georgia Professional Standards Commission ("GaPSC")

investigative report of Pickens' abuse with audio recorded/transcribed statements,

behavioral recommendations from Integrated Behavioral Solutions, pleadings in

this case and others involving Pickens' abuse, and extensive documents in Alex

Williams' matter (some involved Jake).  Mueller Disclosure, Ex. C, pp. 1-2;

Mueller Dep., Ex. B, p. 99, lines 4-6, p. 109, line 19 to p. 110, line 2.

Dr. Mueller has also worked with Dr. Maddox in preparing and overseeing

the ordered program, with oversight from a psychologist with experience in PTSD,

for Alex Williams, whom Pickens abused.  Mueller Dep., Ex. B, p. 256, lines 4-24.

Dr. Maddox worked with Dr. Mueller to address certain challenging behaviors that

arise from his PTSD triggers.  *Id*.  Dr. Maddox has been not just a consultant with

a different abused child, he has been instrumental in helping Dr. Mueller devise the

program for Alex, who suffers PTSD from the abuse he endured for one year with

Pickens.  *Id.*

## II.     <u>Legal Argument and Citation of Law</u>

"A witness who is qualified as an expert by knowledge, skill, experience,

training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the

case." Fed. R. Evid. 702.

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge.  Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

Fed. R. Evid. 702, Notes of Advisory Committee on Proposed Rules.

In determining whether one is an expert and whether his testimony should be

admitted,

> *Daubert* itself emphasized that the factors were neither exclusive nor dispositive.  Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony.  In addition to *Kumho*, 119 S.Ct. at 1175, *see Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996) (noting that the factors mentioned by the Court in *Daubert* do not neatly apply to expert testimony from a sociologist).  *See also Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 809 (3d Cir. 1997) (holding that lack of peer review or publication was not dispositive where the expert's opinion was supported by "widely accepted scientific knowledge"). … A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).  As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an

automatic challenge to the testimony of every expert. *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (noting that the trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").

Fed. R. Evid. 702, Committee Notes on Rules – 2000 Amendment.

## A. **Dr. Mueller is Qualified As an Expert**

Defendant Merritt admits that Dr. Mueller has the proper qualifications to evaluate appropriate behavioral and educational supports.  Defendant Merritt's Motion to Exclude Testimony of Dr. Mueller, Doc. 248, pp. 2-3.  Merritt also admits that Dr. Mueller's profession is to consult in areas of behavior and education for disabled children to schools, other organizations, and families.  *Id.* at p. 9.  Thus, Merritt does not challenge Dr. Mueller as an expert, but instead she challenges his expert opinion in two areas, arguing Dr. Mueller is not qualified to provide any testimony regarding Pickens' illegal punishment of Jake or Jake's PTSD diagnosis.  *Id.* at pp. 9-10.

Dr. Mueller concluded Pickens' actions were abusive, and as such, they are by definition, illegal.  *See U.S. v. Nixon*, 918 F.2d 895, 905 (11th Cir. 1990) (a police detective serving as an expert witness regarding drug dealing referred to the defendant's activities as a "conspiracy" numerous times, and the Court ruled as follows:  "Considered in context, the police detective's use of the term

'conspiracy' was a factual--not a legal--conclusion and did not track unduly the
definition of the offense in 21 U.S.C. Sec. 846.").

 While not a lawyer or law enforcement officer, Dr. Mueller does know what
behavior is legal and illegal in school systems, and he trains local educational
agencies and educators in many states regarding appropriate and inappropriate
interactions and behavioral interventions and management with students.  Mueller
Dep., Ex. B, p. 196, lines 15-17; Mueller Disclosure, Ex. C, pp. 2, 7.  He is also a
professor at Georgia State University, teaching advanced ABA and principles and
methodology of behavior management for challenging behaviors.  Mueller CV, Ex.
A, p. 3.  Dr. Mueller, through his extensive education at the Ph.D. level in school
psychology and his experience and responsibilities, is trained to detect child abuse
and is a mandated reporter of child abuse.  *See* O.C.G.A. § 19-7-5.

 Even Pickens' own expert witness concluded that what Pickens did to Jake
was "child abuse" and "criminal behavior," and as a psychologist, he would have
reported Pickens for child abuse.  *See* Deposition of Tyler Whitney, July 11, 2013,
relevant portions attached as Exhibit E to Plaintiff's Brief in Opposition to
Defendant Merritt's Motion to Exclude Expert Testimony of Dr. Maddox, p. 37,
line 25 to p. 38, line 18, p. 39, line 18 to p. 40, line 18.  *See also id.* at p. 77, lines
1-24 ("psychologically abusive"), p. 129 ("horrific," "shocking," and "appalling"),
p. 130, line 5 to p. 131, line 4 ("harsh and significant abuse").  Pickens' other

expert tries to minimize the Pickens' actions, yet he admits Pickens' behavior was abusive.  Deposition of Peter Ash, June 11, 2013, relevant portions attached as Exhibit H to Plaintiff's Brief in Opposition to Defendant Merritt's Motion to Exclude the Testimony of Dr. Maddox, p. 334, lines 11-12.

The extensive evidence in this case, just some of which is set forth in Plaintiff's Brief in Opposition to Merritt's Motion to Exclude Dr. Maddox's Testimony on pages 11 to 17, establishes Pickens repeatedly and relentlessly abused Jake in the school setting for a three year period of time.  Thus, Dr. Mueller's opinion, as an expert in ABA, education, behavior modification and management, and educational training and consultation on proper behavior modification and management, is supported by and consistent with overwhelming evidence (as well as the conclusion of Pickens' own expert).  Given Dr. Mueller's training, experience, education, and skill, he is competent to testify regarding the impropriety of Pickens' abusive actions in the school setting.

Regarding any reference by Dr. Mueller to Jake having PTSD, there is nothing at all inappropriate or inadmissible about his reliance on that fact or mention thereof.  *Contrary to the direct assertion of Defendant Merritt*, who claims Dr. Mueller's report does not make reference to any medical records or other documents that include the diagnoses of PTSD, Dr. Mueller states on page 1 of his report that in forming his opinions, he reviewed all past psychological

reports, and Dr. Maddox had rendered the diagnosis of PTSD to Jake in his psychological report prior to Dr. Mueller's report.  Defendant Merritt's Motion to Exclude Dr. Mueller's Testimony, Doc. 248, p. 10; Mueller Disclosure, Ex. C, p. 1; Evaluation of Jake Marshall, attached as Exhibit C to Plaintiff's Brief in Opposition to Defendant Merritt's Motion to Exclude Testimony of Dr. Samuel J. Maddox, p. 6.

**B. Dr. Mueller's Expert Opinions Regarding Jake's Needs Is Supported by the Application of Reliable Principles and Methodology to the Facts and Data of This Case**

Although Defendant Merritt admits that Dr. Mueller has the proper qualifications to evaluate appropriate behavioral and educational supports and to consult in areas of behavior and education, she objects to Dr. Mueller's expert opinion as to what Jake requires based upon his behavior and past and current functioning.  Defendant Merritt's Motion to Exclude Testimony of Dr. Mueller, Doc. 248, pp. 2-3, 9, 10.  Making determinations as to what disabled individuals require based upon their functioning and behavior, however, is precisely what Dr. Mueller has been educated and trained to do for almost two decades and is what he so very skilled at doing.  Mueller CV, Ex. A; pages 11 to 17 *supra*.

Defendant Merritt objects to Dr. Mueller testifying that Jake requires long-term collaborative treatment in a hospital setting that specializes in treating individuals with severe developmental disabilities and severe behavior.  Given Dr.

Mueller's extensive expertise in ABA; behavior assessment, modification, and management; skill training; and other related areas and his thorough review of extensive relevant records, data, statements, testimony, interviews, and consultation, Dr. Mueller's opinion is reliable and clearly the product of scientific principles and methodology and their reasonable and appropriate application to the facts and data in this case.

For example, Dr. Mueller explains in his report that Pickens used no consistent or systematic approach to teach Jake language, which was occurring prior to Pickens.  Mueller Disclosure, p. 9.  "The functional approach to behavior assessment and management infers that behavior has a communicative intent for students who are unable to speak.  For children with little or no language, behaviors serve a purpose that allows them (albeit inappropriately) to get their needs met. … [Pickens] escalated the ways in which [Jake] communicated with non-desired behaviors.  Her reinforcement of his behaviors happened for so long that they have still not been reduced after two intensive behavior management placements (Marcus Autism Center and Laurel Heights Psychiatric Hospital)." *Id.* Dr. Mueller further explains that "Jake is worse in academics, language, social skills, functional skills, self-help skills, and behaviorally now than he was in 5th grade.  Integrated Behavioral Solutions is a private behavioral firm who consulted with staff at North Metro to recommend strategies while Jake was there.  Laurel

Heights Psychiatric Hospital, is, in part, a private residential placement for learners with developmental disabilities and behavioral challenges. Marcus Autism Center is a day-treatment program for children with severe behavioral challenges. After Jake was severely abused,… he was placed (or received assistance from, in the case of IBS) at each of these short-term intensive treatment facilities and none of them have been able to eliminate the destructive behaviors Jake learned and/or gained while with Pickens. Following his placement at Laurel Heights for one year, Jake went to a public high school in Rabun County, and they were unable to eliminate his now severe behaviors. Jake is currently back in Laurel Heights Hospital for another residential placement. No one to date has been able to get Jake back to the level of skill and behavior he was at before he was brutalized by Pickens. His behaviors escalated from disruptive behaviors to destructive behaviors. He began to hit, bite, pinch, destroy property, urinate and defecate on himself, and to self-injure." *Id.* at p. 12.

Based upon Jake's presentation, behaviors, the data, facts, and documents, Dr. Mueller reviewed, his interviews with Jake's mother, and his education, training, experience, skill, knowledge, and expertise, Dr. Mueller concluded that because no intervention placement or prior intensive interventions, all of which Dr. Mueller is well aware, have worked, Jake requires an intensive placement for several years followed by intensive treatment in the home setting. *Id.* at p. 13;

Mueller Dep., Ex. B, p. 117, line 6 to p. 127, line 2; p. 130, lines 10-25 (Dr.

Mueller explains intensive therapy, need for transition planning, behavior protocols

relating to Jake's need for long-term placement at Kennedy Krieger), p. 133, lines

1-19 (Dr. Mueller explains that Kennedy Krieger is an intensive behavioral

intervention unlike Laurel Heights and that Jake left Laurel Heights with severe

behaviors), p. 135, line 15 to p. 137, line 8, p. 137, line 20 to p. 138, line 24, p.

139, line 13 to 140, p. 1, p. 141, line 13 to p. 143, line 19 (Dr. Mueller explains the

differences in Laurel Heights and Kennedy Krieger, regarding why Jake requires a

placement such as Kennedy Krieger), p. 144, lines 2-25 (issues with Laurel

Heights records discussed), p. 147, lines 3 to p. 149, line 18 (Dr. Mueller explains

how Kennedy Krieger differs and its level of expertise with ABA, behavior

modification, and FBA's), p. 152, line 20 to p. 154, line 12 (further explanation of

why Jake needs a facility like Kennedy Krieger), p. 155, line 22 to p. 157, line 23

(Dr. Mueller explains Jake's severe behaviors and the fact no one has figured them

out at this point and why Jake requires a placement such as Kennedy Krieger), p.

158, line 11 to p. 161, line 22 (Dr. Mueller explains the need for intensive analysis

and intervention, cyclic variations in behavior, inconsistency in locations), p. 164,

line 15 to p. 167, line 17 (Dr. Mueller explains how prior residential program

targeting the same behaviors failed; how intervention at the Marcus Institute failed;

staffing issues for home programming; the need for immediate psychiatry,

psychology, and therapies; the need for a well-controlled first treatment; best practices in conducting an FBA), p. 178, lines 20-24 (Dr. Mueller explains that the information he relied on, in part, "was through three years of middle school, North Metro, Marcus, Laurel Heights, Rabun County school records, and he was back at [Laurel Heights] at the time.").  Dr. Mueller explained that due to the duration of the behaviors, number of behaviors, Jake's current size, staffing issues, day-long behaviors, effects of the abuse, and Jake's need for assistance and coordination of clinical psychology and medication management, Jake requires an intensive program at Kennedy Krieger instead of programming by Dr. Mueller and SBG.  *Id.* at p. 180, line 1 to p. 181, line 2.  Dr. Mueller explained that because of Jake's presentation, unknown reinforcers of Jake's behavior, and other behavioral considerations, Jake requires a setting where his behavior can be understood and where proper behavior techniques can be implemented throughout the day.  *Id.* at p. 181, line 23 to p. 183, line 8.  Dr. Mueller concludes, based upon his knowledge of the facts and data and his expertise, that Kennedy Krieger is where Jake will receive the help he needs.  *Id.* at p. 184, lines 13-16.

Dr. Mueller explained in his report as well that he anticipated Jake will require at least 2 to 5 years in a long-term collaborative residential treatment facility highly qualified to address Jake's behaviors because 1) Jake made limited short-term gains after a year stay in a residential psychiatric hospital, 2) he lost

skills, 3) he has multiple and severe behavioral challenges, 4) he has severe

developmental disabilities, and 5) he suffered abuse for three years.  Mueller

Disclosure, p. 13.  Dr. Mueller also explained that Jake would require intensive

long-term supports in the home for 10 years, at the least, and possibly Jake's entire

life for 40-50 hours a week in order to maintain gains made at the long-term

residential facility and in order to regain and advance skills lost and that were

never able to develop due to and since the abuse.  *Id.*  According to Dr. Mueller, a

long-term proper ABA treatment facility followed by intensive ABA home

programming and training is necessary, but if Jake does not respond as necessary

with this program due to the severe abuse and resulting behaviors and regression,

Jake will require residential programming for life.  *Id.*

This is not speculation but instead based upon the facts and data and Dr.

Mueller's application of sound principles of ABA to them, and while Dr. Mueller

cannot know today exactly how many years Jake will require in a proper, long-

term psychiatric residential hospital with, intensive ABA, Dr. Mueller does know

that two stays at a psychiatric hospital (one for a year) lacking an intensive ABA

program and a short-term ABA day program did not work.   Thus, the information

and data applied to reliable principles and methodology of ABA render Dr.

Mueller's expert opinion reliable.[2]

Regarding the costs associated with placement at Kennedy Krieger, Dr.

Mueller consulted with Dr. Maddox on this point, and as such, it is admissible

evidence.  *See U.S. v. Steed,* 548 F.3d 961 (11th Cir. 2008) ("subject to the

limitations in Rule 703, an expert witness [is] permitted to base his testimony on

inadmissible hearsay").  Furthermore, before he testifies, Dr. Mueller will again

confirm the costs at that time of Kennedy Krieger and/or some similar facility.

### C. Dr. Mueller's Opinions Will Assist the Trier of Fact

Dr. Mueller's expert opinions regarding Jake; Pickens' abuse and its impact;

Pickens' alleged data; Jake's behavioral regression; ABA; education of individuals

with severe cognitive disabilities; education of individuals with severe behaviors;

appropriate and inappropriate behavior assessment and programming; punishment-

based, abusive acts to severely disabled children and their impact; education and

special education issues, including but not limited to BIP's, IEP's, FBA's,

---

[2] Pickens claims it is appropriate for Jake to receive less intense intervention and even home programming when neither of her expert witnesses are experts in education, special education, or behavior analysis, modification, or management. Dr. Mueller, however, is, and he should be allowed to share his expert opinions with the trier of fact and to rebut any assertions by Pickens' experts.  *See U.S. v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1992) (citation omitted) ("It is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.'").

placement, behavior modification, discipline, and psychoeducation; and Jake's injuries and treatment needs because of the Defendants' actions are very relevant and certainly subjects of expertise that will assist the jury.  In fact, it is ludicrous for Defendant Merritt to argue that Dr. Mueller only offers what lawyers will argue in closing, as Dr. Mueller's expertise is clearly far beyond the understandings of the average citizen.

### D. Dr. Mueller is Competent to Testify

Defendant Merritt's motion is disorganized and repetitive, making it difficult to formulate an organized reply. Thus, this section of Plaintiff's brief will address some random, miscellaneous arguments made in Merritt's motion.

Merritt argues Dr. Mueller cites to facts, as if that is wrong, but at the same time, criticizes him because for not providing deposition and document citations. This is not required, and Dr. Mueller's reports and testimony establish he has comprehensive and thorough knowledge of the facts and data.  Mueller Dep., Ex. B; Mueller Disclosure, Ex. C; Dr. Mueller's Expert Rebuttal Report, March 15, 2013, attached hereto as Exhibit D, (hereinafter "Mueller Rebuttal, Ex. D").  In fact, Dr. Mueller has a much more thorough, detailed, and accurate understanding and application of the facts than Pickens' experts.

Merritt also argues Dr. Mueller developed his "methodology" expressly for purposes of his report and testifying, yet there is no support for this allegation, and

it is not true.  Instead, as his reports and testimony demonstrate, Dr. Mueller relies upon application of reliable principles of ABA and the education of disabled children with severe behaviors and disabilities to the facts and data of this case, and Dr. Mueller did not "develop" any methodology for this case.  *Id.*  Merritt also broadly claims without support that Dr. Mueller's opinions are replete with unfounded conclusions.  Yet, as the citations contained herein establish, Dr. Mueller relies upon and implements standard principles of ABA.  Merritt even accuses Dr. Mueller, as she does Plaintiff's other two experts, of having failed to be careful in formulating his opinions, but a cursory review of his disclosure, rebuttal disclosure, and deposition testimony belie such an unsupported argument. Mueller Dep., Ex. B (Dr. Mueller explains his reasoning and analysis, given ABA principles, to his opinions in this case); Mueller Disclosure, Ex. C (Dr. Mueller explains the science of ABA and its application); Mueller Rebuttal, Ex. D (further *significant* detail and data is contained in this report and applied to scientific principles and methodology).  In fact, Dr. Mueller's reports and testimony actually evidence his extensive, detailed, and comprehensive knowledge of facts and data spanning over almost 20 years as well as his application of ABA principles and methodology to those facts and data, and Dr. Mueller's analysis is thorough and comprehensive.

Merritt alleges, once again without any support and without any mention as to how, that Dr. Mueller failed to consider alternatives.  Plaintiff is not sure what Merritt is referencing with this allegation, and she should not allowed in a reply brief to raise a new argument not set forth in her motion.  Should Merritt try to argue improperly that Dr. Mueller did not consider alternatives to a long-term, comprehensive, intensive ABA psychiatric hospital setting for Jake followed by long-term home programming. Dr. Mueller absolutely did consider numerous options and he explained his reasoning and why potential alternatives are inappropriate and will not work, as cited earlier herein.  *See, e.g.,* Mueller Dep., Ex. B, p. 133, lines 15 to p.135, line 18, p. 139, lines 13-25, p. 142, line 25 to p. 143, line 19, p. 144, lines 11-25.  Merritt even goes so far as to claim that Dr. Mueller has provided no information regarding whether his experience and expertise is known to reach reliable results.  This is far from accurate.  Dr. Mueller's curriculum vitae is filled with books, book chapters, journal articles, original research, and more indicating the efficacy of Dr. Mueller's expertise and skill.  Mueller CV, Ex. A, pp. 6-19.  In addition, upon questioning, Dr. Mueller testified under oath to his and his company's effectiveness, and school systems in numerous states retain Dr. Mueller and SBG to assist them in behavior assessment, analysis, modification, and management of disabled children with severe behaviors.  *See, e.g.,* Mueller Dep., Ex. B, p 100, line 20 to p. 102, line 7; Mueller

CV, Ex. A, p. 19; Mueller Disclosure, Ex. C, p. 2.  Merritt also condemns Dr. Mueller because his exhibit list is that of Dr. Maddox's and Ms. Estes', but it makes perfectly good sense for an expert to request from counsel an exhibit list, for that is often beyond the realm of experts who do not make a living or large portion thereof from testifying as an expert.  Merritt's conclusion that because the evidence lists are the same this somehow means that Plaintiff "manufactured" Dr. Mueller's report is belied by Dr. Mueller's sworn testimony and by Dr. Mueller's report itself.  Mueller Dep., Ex. B, p. 116, lines 8-14; Mueller Disclosure, Ex. C.  *See also* Mueller Rebuttal, Ex. D.

Merritt also alleges that Dr. Mueller is merely acting as a fact finder, but again, his testimony and disclosures establish otherwise.  *Id.*; Mueller Dep., Ex. B, p. 105, lines 2-12 (Dr. Mueller testified he understood his task was not to determine fact.  In one breath, Merritt attacks Dr. Mueller for not giving actual cites to the evidence in the record and in the other, she condemns him for discussing relevant facts in the record.

### E. <u>Consideration of Facts Regarding Other Disabled Children Abused is Relevant</u>

Both Dr. Maddox and Dr. Mueller found it useful and informative to interview the parents of other disabled children whom Pickens abused.  Mueller Dep., Ex. B, p. 110, lines 5-8, 19, p. 266, line 22 to p. 268, line 21; Deposition of Dr. Samuel J. Maddox, July 10, 2013, attached as Exhibit A to Plaintiff's Brief

Opposing Defendant Merritt's Motion to Exclude the Expert Testimony of Dr.

Maddox, p. 137, line 2 to p. 138, line 9.  Both experts treat a different child (Alex

Williams) abused by Pickens, and both experts found it helpful to find out as much

information as they could about the abuse suffered, the effects of the abuse on the

other children at the time and currently, and other such relevant information (which

was important, as the children are all severely impaired and cannot explain in

words and sentences the abuse they suffered and its impact).  *Id.*

Pickens' experts' information regarding similar responses to the abuse and

the impact of the abuse on Jake's classmates should not be excluded from

evidence.  The disabled children whom Pickens abused regressed with toileting,

communication, self injurious behavior, and skills, and they present with similar

trauma impact, such that this information is relevant.  Jake is a non-verbal child,

and Pickens' experts claim what happened to Jake did not impact him, yet he and

the other children all suffered and responded in numerous similar ways.  Pickens

argues that while she never did any of these acts, if she did, she had to do so to

control Jake.  The fact she did these acts to other children who did not present like

Jake is relevant, as is the fact she abused disabled children in front of Jake.

### F.  The Impact of Defendants' Actions Are Relevant

Plaintiff's experts' opinions regarding the injury suffered by Jake due to

Boyd's and Merritt's failure to report the abuse and their cover up of the abuse is

relevant and should be presented to the jury, for this caused significant injury to Jake, as the behavior was reinforced for years by Pickens all the while no proper behavioral techniques were used, the abuse was on-going, and treatment was delayed.  What Merritt and Boyd did and did not do has been, in part, admitted, and there are numerous fact witnesses who have already testified they allowed the abuse to continue and covered it up.

### III.   Conclusion

For the foregoing reasons, Defendant Merritt's motion should be denied. Should this not be clear to the Court, Plaintiff requests a *Daubert* hearing.

### IV.   Certification

Pursuant to Local Rule 7.1D, the undersigned hereby certifies that the within and foregoing Brief was prepared with Times New Roman 14-point font, as permitted by Local Rule 5.1C.

This the 22nd day of August 2014.

　/s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiff

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
Email:  chris@chrisvancepc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Plaintiff's Brief** has been served

electronically via email upon counsel for all Defendants.

This 22nd day of August 2014.

 /s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199

Counsel for Plaintiff

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
Email:  chris@chrisvancepc.com